CRUSE (CRAWFORD v.). See Case No. 3,-367.

CRUTTENDEN (THOMAS v.). See Case No. 13,895.

---

## Case No. 3,457.

### The CUBA.

[2 Spr. 168.][1]

District Court, D. Massachusetts. Aug. Term. 1862.

PRIZE—PRACTICE—PROCEEDINGS—PROOF.

1. Documents found on board a prize are not to be inspected by any person before the claims have been filed, and the evidence in preparatory completed.

2. A vessel documented as neutral, condemned as enemy's property, and for an attempted breach of blockade, on circumstantial proof,—simulated papers, false log-book, false testimony, &c.

3. A motion for leave to take further proof must set forth the specific facts to be proved, the sources of evidence, and the reasons for expecting it. Such motion refused to persons who had shown themselves unworthy of trust and belief.

The master of the prize schooner Cuba, Dominick Querin, filed a petition, sustained by an affidavit, stating that he desired to claim the vessel and her cargo in behalf of the owner, one John McLarnand, a British subject residing in Havana, and praying for leave to inspect the ship's papers, and other documents taken by the captors, and in the custody of the court, to enable him to state the claim correctly.

C. L. Woodbury, for petitioner, relied on The Port Mary, 3 C. Rob. Adm. 233.

R. H. Dana, Jr., U. S. Atty., for the United States and the captors, resisted the petition, and cited The San Jose Indiano [Case No. 12,322].

SPRAGUE, District Judge. The practice of prize courts is to keep under seal all papers found on board the prize, as well private papers, sailing directions, &c., as the regular documents of the ship, to be seen by no person until the claims have been put in, the evidence of the crew of the captured vessel taken, and the cause ready for a hearing. Publication is then ordered, and the papers are open to counsel on each side. One object of this practice is that the master and crew of the prize shall testify to what is in their own knowledge, and not be able to shape their testimony so as not to contradict the documents. Another is, that persons coming forward to claim captured property shall state their claims according to the facts, without the opportunity to shape them according to documents or papers on board. If the ship's papers are true, and the claims true, there will be no material variation, and no injustice is done to claimants, for mere

[1] [Reported by Hon. Richard H. Dana, Jr., and here reprinted by permission.]

formal or verbal mistakes in claims may always be freely corrected, if the examination shows them to be bona fide, and no claim is ever rejected for an error that is amendable. The San Jose Indiano [Case No. 12,322]. But, if the papers are false, simulated, equivocal, or contradictory, the obligation to put in the claims without opportunity to inspect the papers, will almost always lead to detection of the fraud. Another reason given for the practice is, that, if the papers were open to all, persons might come forward who had no actual interest, and represent the interests indicated by the papers.

The only case which has been found, where the court allowed inspection of documents, is that of The Port Mary, 3 C. Rob. Adm. 233. But in that case the claims had been filed by the master, the positions of the claimants taken, and their consequences assumed; and the master only asked to inspect the manifest to ascertain the name of the shipper of a part of the cargo, about which he was uncertain, the ship being a general ship, with a variety of shippers, whose names he could not be expected to know. In the present case, no claim has been filed, or even prepared and presented; and the petitioner states, without a question, the name of the sole owner of the vessel and all the cargo, except certain articles which he specifies, and which he says are his own venture. Indeed, he states no reason whatever why he should inspect the papers, except those which have led to the policy of excluding them from inspection. The argument of his counsel, in fact, gives up all claim to see any papers, except a power of attorney, said to have been given to the master by the owner. The argument is that the master, under this special power, should follow only his authority, and not exceed it, or fall short of it, which he cannot be sure of doing unless he can inspect it. But the petition states the power to be a general power to do all things with the vessel and cargo, which the principal, McLarnand, could do if personally present, and does not intimate any ignorance of its extent and character. The master, as agent of the owners, and lawful bailee of the ship and cargo, must make his claim bona fide, to the best of his knowledge. If the voyage is a hostile one, or if an attempt is made to cover the ship or cargo by false papers, this power of attorney may be the very paper the master ought not to inspect before stating his claim; and if, after publication of testimony, there appear no grounds for condemnation, errors in a bona fide claim work no loss or injury. It seems, that a part of the cargo of this vessel was taken, at Ship Island, on appraisement, for the use of the army, and only the residue sent into this district. This court has jurisdiction over the whole, and has been requested by the libel to adjudicate upon the whole. The petition does not intimate that the master is ignorant what part is here, and

what was left; but that he may not even appear to be at a disadvantage as to what cannot affect the question of the character of the vessel and cargo, as prize or no prize, the court will suggest to his counsel that the return of the prize commissioners, showing what cargo was brought here, and the papers showing the taking and appraisement at Ship Island, are open to inspection, not being of the class of excluded papers. The petition is refused.

In November, 1862, the following decision was given on the merits of the case:

SPRAGUE, District Judge. This vessel and cargo are claimed by John McLarnand, a British subject, who, at the commencement of this enterprise, resided at Havana. This claim, in the name of McLarnand, is made by the master, Dominick Querin. Condemnation is asked by the captors on two grounds: First, that the property was enemy's property; second, that there was an attempt to violate blockade.

As to the vessel, it appears that the Cuba was built at Mobile, and that she sailed from that port on the 21st of March last, with a cargo of cotton, ran the blockade, and arrived at Havana on the evening of the 24th of March, and on the 26th the crew were employed in discharging the deck-load. In this voyage, from Mobile to Havana, Dominick Querin was the master, and Charles White was the mate. On the 31st of March, McLarnand, in whose behalf this claim is made, took out a provisional register, as it is called, in his own name, as sole owner; and, on the 4th of April, the vessel sailed from Havana with this cargo on board, ostensibly for Matamoras. When two days out, she was boarded by the United States gunboat R. R. Cuyler, and duly warned of the blockade, and permitted to proceed. On the 10th of April, she was captured by the United States gunboat Kanawha, off the coast of Florida, between Pensacola and Mobile, and, as the mate says, about fifty miles from the latter place. Some of the papers indicate that the cargo was shipped by several Spanish houses at Havana, but the manifest states the whole was shipped by one Santa Maria, and consigned to Dominick Querin, the master. No other consignment appears, no instructions to Querin or to any correspondent, and no bills of lading have been found, and not a paper that indicates that McLarnand was the shipper or owner of any part of the cargo, or had any thing to do with it, except that it was on board a vessel documented in his name. Yet, not only the whole of this vessel, but almost all the cargo, is claimed as his property. These circumstances call for explanation.

If this vessel was sold to McLarnand, the sale and transfer must have been made between the 25th and 31st of March, inclusive. By whom was the sale made? For what

consideration? And for whose use was Mc-Larnand to hold the title? What became of the cargo of cotton and its proceeds? All these questions Querin must have been able to answer. But, instead of doing so, he has, in his deposition, sworn that he knew nothing of the voyage from Mobile to Havana; that he never saw this vessel until about the 27th of March; that he does not know when the cargo, laden at Havana, was put on board; and that he never knew McLarnand until just before he took the command, which was on the 2d or 3d of April. White, the mate, also testifies that he had no knowledge of the previous voyage, or of the lading of the cargo, and that he joined the Cuba at Havana only twenty-four hours before she sailed. Yet there can be no doubt that Querin was the master, and White the mate, on the voyage from Mobile to Havana. There were found on board, after the capture, two log-books of the voyage from Havana, one in ink, and the other in pencil, both in the handwriting of White. There was also found a log-book in pencil of the voyage to Havana in the same handwriting. In this same book there was, in ink, a description of the cargo from Mobile, and a declaration that Querin was the master, all in the handwriting of White. Besides this, there was found a bill of goods sold to Querin, dated at Mobile on the 11th of March; and it is proved that he had a family residing at that place.

The log-book in ink, which we have before spoken of, was mutilated by tearing out several leaves. One of these leaves, however, was found, and described a part of the voyage from Mobile to Havana. This also was in the handwriting of White. But the master and mate closed all inquiry into the previous history of this vessel by a bold and positive denial of any knowledge prior to the time when she had her cargo on board, at Havana, for the voyage on which she was captured, thus effectually cutting off all questions respecting the transfer of the vessel, and the purchase and lading of the cargo. The first day on which McLarnand appears to have had any connection with this vessel is the 31st of March, when the provisional register was taken out; and on the same day he gave a power of attorney to Dominick Querin to sell the vessel, or any part of her. The authority conferred by this instrument is without restriction; so that Querin could have disposed of the vessel when and where, and for such consideration, as he should see fit. He might have sold the major part, leaving McLarnand only the minor interest, to be entirely controlled by strangers and foreigners. The cargo also was consigned to Querin, and subject to his absolute control; and Querin testifies that the cargo belonged to McLarnand, as he believes that McLarnand so told him; yet, according to his testimony, he never knew McLarnand until just before he took command, on the 2d or 3d of April. Here, then, we find Dominick Querin, an inhabitant of Mobile, sailing from that port on the 21st of March, as master of this vessel, with a cargo of cotton, and on the 4th of April we find him sailing on board the same vessel, as master, with a cargo peculiarly adapted to the wants of the Southern Confederates, and with absolute control over both vessel and cargo, having authority to dispose of either or both at his pleasure by power of attorney and consignment from the ostensible owners. Yet this same Querin has given no account of the transfer of the vessel, or of the disposition of the cotton, or of the purchase of the new cargo; but effectually prevented the prize commissioners from requiring answers touching those and other important particulars, by an audacious denial of any previous knowledge of this vessel. This same Querin is the only person who has taken any interest in the vessel or cargo since their capture. He arrived in Boston as early as the 14th of May last, five months ago. It was his duty to have immediately informed his employers at Havana, if any such there were, of his situation, that they might furnish aid and instructions for the protection of their property.

The intercourse between New York and Havana is frequent, and the transmission of intelligence regular; and yet not one word has been heard from McLarnand or any other person in Havana. The test affidavit, in support of the claim, is made by Querin alone. His oath is of no value. There are seven documents signed by Spanish officials, four of which appear to be invoices, and the other three permits to lade certain goods on board the Cuba. Five are given to one Santa Maria, and two to Cahusac Brothers. Six of them describe the vessel as the Confederate schooner Cuba, and one only as the English schooner Cuba. Some bear date the 1st, and others the 2d, of April. The name of the vessel was nowhere to be found upon her, except on the inside of the companion way to the forecastle. The master testifies that a part of the crew were English. In this he is contradicted by the crew list. As before stated, the Cuba sailed from Havana on the 4th of April, ostensibly bound for Matamoras. On the 6th, she was boarded by the United States ship R. R. Cuyler, and permitted to proceed, after due warning of the blockade. Previous knowledge of the blockade was also abundantly proved. On the 10th of April, she was found off the coast of Florida, far from her true course to Matamoras, sailing directly toward Mobile. These are very untoward circumstances, and call imperatively for an explanation. This has been attempted. It is said that there was a gale of wind for nearly three days, during which she was compelled to lay to, and that she drifted toward the coast of Florida. It was testified by a very competent nautical expert, the only one whose testimony has been offered, that if she had laid to, as

stated, the drift would not have been as alleged. This, however, is but opinion, and might require careful scrutiny, if it stood alone. But, as already stated, there were found on board this vessel two log-books, one in ink and the other in pencil. The former was evidently made for exhibition to belligerent cruisers; the latter, to show the true run of the vessel, and her actual position, so essential to be known by the navigator. Both these logs were in the handwriting of the mate, yet they differ materially. The ink log makes the track of the vessel to diverge toward Matamoras, and describes a gale of wind which compelled them to lay to, and thick weather in which no observation could be taken. The track described in the pencil log is such as would have been made by a vessel bound from Havana to Mobile, first coasting the island of Cuba, by reason of the current, and then making directly for that destination. This course was pursued until eleven o'clock at night on the eighth, when she put about, and sailed in an opposite direction, about fifty-four miles, when she again put about, and resumed her former course toward Mobile. The reason for this manoeuvre is not given. It may have had reference to the blockading squadron, and an opportunity for eluding it, or to a better time for making the land, as the wind was south-west, which on that coast threatens bad weather. In the pencil log there is no gale of wind compelling the vessel to lay to, no drifting, and observations are noted every day. And further, this log, both on the 8th and 9th of April, states the bearing of Mobile point, and the distance from that place, thus clearly showing that the nautical calculations were made with reference to Mobile, as the port she was approaching. This pencil log-book, upon the accuracy of which the safety of the vessel and all on board depended, more than countervails all other evidence respecting the actual course and management of the vessel. But the Cuba was not only far out of her course to Matamoras, and in very suspicious proximity to a blockaded port, but she was discovered sailing, in fine weather, directly for that port. To account for this, the master asserts that he was short of provisions, and was endeavoring to find some of the blockading squadron in order to obtain a supply. Now this vessel, with the same master and mate, had sailed from Mobile and run the blockade only twenty days before, an exploit very likely to be notorious; and is it credible that he was now seeking this blockading squadron? Was he, in fact, short of provisions? He had been only six days from Havana; and an average passage from that place to Matamoras, his pretended destination, is seven and a half days; yet he swears that he was out of meat, and had bread for only three days; that is, that he left Havana without provisions for an average passage, knowing, as he must, that the voyage was liable to be protracted much beyond that time by the ordinary contingencies of the sea.

After a full hearing upon the evidence in preparatory, the counsel for the claimant filed a motion to be admitted to further proof. The objections to this motion seem to be insuperable. Where the difficulties presented by the evidence in preparatory are out of the reach of any rational solution, further proof will not be admitted; and even if doubts exist, which might, perhaps, be removed by collateral evidence, still an order for further proof will not be granted to a person who, by his mala fides and actual attempts at deception, has shown himself capable of abusing it. The Alexander [Case No. 164]; The Dos Hermanos, 2 Wheat. [15 U. S.] 80; The Juffrouw Anna, 1 C. Rob. Adm. 126; 1 Wheat. [14 U. S.] Append. 505; The Betsy [Case No. 1,364]; The Graaff Bernstorf, 3 C. Rob. Adm. 117; The Vrouw Hermina, 1 C. Rob. Adm. 163. By whom is this requested? Dominick Querin. He is the sole actor. No other person has taken any step, made any communication, or in any way connected himself with this claim. And Querin and his mate have deliberately sworn that they knew nothing of the voyage from Mobile to Havana, although they were both on board, one as master and the other as mate. And to this falsehood they have added several others. This motion is very brief, and in the most general terms. Querin merely moves the court for leave to exhibit further proof that the said schooner and her cargo are bona fide property of the said McLarnand, and entitled to the rights of neutrals. In support of this motion, we have only a single affidavit made by the proctor for the claimant. Neither the motion nor the affidavit suggests any explanation of the circumstances which bear so strongly against this claim. The affidavit states an expectation to obtain evidence to maintain the issue of ownership and destination, but gives no detail of facts; and, as to the sources of proof, it says that he expects testimony from McLarnand and Santa Maria and other persons, and by various papers. The proctor who made this affidavit must have derived all his information from Querin, who has undergone a searching examination before the prize commissioners to extract all his knowledge respecting the vessel, the cargo, and the voyage. No reliance is to be placed upon Querin's statements. The court is asked to give to Dominick Querin a roving commission to go in search of evidence, without limitation as to persons or papers, and without specification of facts. There is no reason to suppose that any further proof can be obtained material to the present inquiry, much less that any reliable evidence is to be expected through such instrumentality. The papers found on board, taken in connection with the other evidence, have so developed the course of this voyage,

from its inception at Mobile to its termination by the capture, that no rational doubt can remain that this cargo was the proceeds of the outward cargo of cotton; that the transfer and provisional register at Havana, and the clearing for Matamoras, were all colorable, for the purpose of deception, and that her real destination was Mobile.

The motion for further proof must be refused, and the claim rejected, and the vessel and cargo condemned as enemy's property, and for attempting to violate the blockade.

There are also separate claims by Querin and White for a few articles alleged to be their private adventures. Querin was a permanent resident in Mobile, and his claim must be dismissed, and the property embraced in it condemned as enemy's, and for attempt to violate the blockade. The claim of White must also be dismissed, and his goods condemned for an attempted breach of blockade, and for his misconduct in making a false log-book, and taking a false oath to conceal the character of the voyage, and protect enemy's property.

A decree of condemnation was made, and afterwards a decree of distribution, giving half the value of the vessel and cargo to the gunboat Kanawha, and half to the United States.